WARFORD, Respondent, v. SMITH, Sup't of Banks, Appellant.

(212 N. W. 914.)

(File No. 6155.   Opinion filed April 1st, 1927.)

1.  Banks and Banking—Conversion—Trover—Evidence, Not Showing Mortgage Was Ever in Defendant's Possession, Held Insufficient to Support Verdict For Conversion of Mortgage.

In action for conversion of mortgage where there was no evidence that mortgage was ever in possession of defendant bank, judgement for plaintiff was error.

2.  Appeal and Error—Findings—Whether Alleged Conversion Of Mortgage by Vice-President of Defendant Bank and Managing Officer of Security Company Was Act of Bank Held Fact For Trial Court.

In action against bank for conversion of mortgage, whether acts of bank's vice president were those of bank or those of security company, of which he was managing officer, was question for trial court, rather than appellate court, to determine.

3.  Banks and Banking—Depriving Bank Sued for Conversion of Mortgage of Right to Show Actual Value Thereof Held Reversible Error (Rev. Code 1919, § 1987).

In action against bank for conversion of mortgage, assuming plaintiff made out prima facie case of value by showing amount secured thereby, under Rev. Code 1919, § 1987, depriving defendant of right to show actual value of mortgage at time of alleged conversion was reversible error.

---

Note.—See, Headnote (1) and (3), American Key-Numbered Digest, Banks and banking, Key-No. 179, 7 C. J. Sec. 569; (2) Appeal and error, Key-No. 842(1), 4 C. J. Sec. 2538.

Appeal from Circuit Court, Grant County; Hon. J. J. Batterton, Judge.

Action by D. M. Warford against F. R. Smith, as State Superintendent of Banks, in charge of and on behalf of, the Big Stone City State Bank, for the conversion of a mortgage.   From

a judgment for plaintiff, defendant appeals. Reversed and remanded.

*Thad L. Fuller,* of Millbank, *Ed. L. Grantham,* of Aberdeen, and *Roy E. Willy,* of Pierre, for Appellant.

*Robert D. Jones,* of Millbank, and *Cliff & Cliff,* of Ortonville, Minn., for Respondent.

MISER, C. In September, 1919, respondent, Warford, who was engaged in the purchase and sale of real estate, contracted to purchase from one Williams 165 acres of land in Pope county, Minn. By the contract of purchase he was to assume a mortgage thereon for $5,000, and to make a final cash payment of $9,957.50 on March 1, 1920. In the fall of 1919 he contracted to sell this land to one Sauer, who was also in the real estate business. In February respondent told the manager of the Gold Bros. Security Company that he would need some money about March 1st, and was told that he could have it; but later, in February, the manager told him that money was hard to get, and he would have to make arrangements elsewhere for it. The Gold Bros. Security Company had handled the account of respondent since 1914. Until December 2, 1920, the account showed frequent overdrafts, sometimes in excess of $3,000, on which overdrafts interest was charged. The security company handled the accounts of twenty-five other real estate speculators in the same way, accepting from them notes and mortgages, and crediting their respective accounts with the same, and then disposing of said notes and mortgages to eastern buyers. E. S. Gold was the secretary and managing officer of the security company. In the same building was Gold & Co. State Bank—which subsequently adopted the name of Big Stone City State Bank, now appearing by F. R. Smith, superintendent of banks, appellant herein—Gold Bros. Brick Company, and the branch office of the Southern Minnesota Joint Stock Land Bank. One L. A. Gold, in 1919 and 1920, was the vice president and managing officer of Gold & Co. State Bank. He was also vice president of the security company; and E. S. Gold, the managing officer of the security company, was vice president of the bank. The members of the Gold family were the principal stockholders in charge of all the corporations in that suite of rooms. Each of these corporations, however, was separate entity, having some

officers, directors, and stockholders in each not interested in, nor connected with, the others. Each had a separate office, although all within one large suite of rooms for the conduct of their several lines of business.

The bank did not permit overdrafts; whereas overdrafts were frequent among the accounts of the security company. In fact, one of the reasons for the organization and existence of the security company was for the accommodation of accounts of that character.

On August 8, 1921, upon the demand of a Minneapolis bank with which they were doing business, respondent's account was transferred from the security company to the bank. Prior to August 8, 1921, respondent had had no ledger account with Gold & Co. State Bank, although his deposits had been entered in a pass book which purported to be a pass book of the bank, and he had drawn checks on the bank, which checks the bank charged to the account of the security company, turning over the checks, at the close of the day's business, to the security company, which charged them to respondent's account; the bank acting, in this manner, as a clearing house for some 25 or 30 accounts of the security company. From early in 1914 until June, 1920, respondent had lived at Big Stone City where the offices of said bank and security company were located, and, after that, at Ortonville, Minn., a few miles east of Big Stone City. He testified that, until he was notified on August 22, 1921, he had thought that the account was with the defendant bank. How the Security Company could charge and collect interest on his overdraft, pay his fraternal insurance, real estate taxes and like bills, collect interest on his mortgages, and assign a mortgage to him, and charge his account with fire insurance payments, and credit his account with interest on this Sauer note, all of which appears from the record evidence herein, and do this without his knowledge of the fact that he was doing business with the security company, is not explained.

In December, 1922, the bank passed out of the control of the Gold family, and L. A. Gold ceased to be its cashier and managing officer. The bank, however, was operated as a state bank until after the trial of this action in circuit court, and until the fall of 1925. When L. A. Gold severed his connection with the bank, he took over the management of the security company. At some time

prior to the trial of this action the security company had been placed in the hands of a receiver; and the security company was so handled at the time of the trial.

About March 1, 1920, respondent went to E. S. Gold, manager of the security company, to get some money, despite the conversation had prior thereto. According to Warford, the following conversation took place:

"He (E. S. Gold) said, 'How much money do you need?' I said I could get along with $5,000. He said, 'Good. But you will have to give me some collateral.' I said, 'All right. How about that Sauer loan?' He said that was all right; and I said, 'Go ahead and use it.'"

It appears that this same E. S. Gold had also drawn the contract between respondent and Sauer when respondent sold the land to Sauer, and that, at respondent's request, about March 1, 1920, Gold prepared and sent to Sauer for execution a note and mortgage for $9,000. This was at the request of respondent. This note was made to the security company as payee; and the mortgage securing the same was made to the security company as mortgagee. E. S. Gold testifies that these mortgages were so made with the knowledge and consent of Warford. Warford contends that he did not know until 1923 that this note and mortgage were not made payable to him. The mortgage was recorded on March 11, 1920. How Warford, who dealt extensively with the security company in real estate mortgages and notes, and who had handled one bond issue through that company, expected either the security company or the state bank to use said note or said mortgage without indorsement or assignment, is not explained. The record shows that, a year prior thereto, another note and mortgage for a large amount was also made to the security company, and assigned to Warford. On March 6th Warford executed his note for $5,000 to the bank, and left it on the desk of E. S. Gold, who thereupon sold the note to the state bank, and gave Warford credit for $5,000 on his account with the Gold Bros. Security Company. A week later, on March 13th, Gold Bros. Security Company sent to the Central Bank of Saint Paul, Minn., its own demand note for $9,000, and, as collateral thereto, the mortgage in suit, purporting to be, and described in the accompanying letter as, a first mortgage, although, as a matter of fact, it was second to a $5,000

mortgage. It instructed the Central Bank, if satisfactory, to credit the account of Gold & Co. State Bank, giving the security company advice of the credit. On March 15th the Central Bank wrote the security company, acknowledging receipt of the security company's note and collateral, and credited the account of Gold & Co. State Bank, which bank thereupon credited the account of the security company with $9,000.

Six months later, when respondent's $5,000 note came due, he executed a renewal note for $5,000; and at the same time and at the same place, namely, at the desk of E. S. Gold of the security company, he executed a further note for $4,000, stating that he had ascertained that they had secured $9,000 on the Sauer mortgage, and that they had not treated him fairly. According to Warford's own testimony, E. S. Gold took this note into the bank proper, and showed it to L. A. Gold, who was the cashier of the bank, and who protested against taking the paper; but, upon the insistence of E. S. Gold, the note was thereafter purchased by the bank from the security company. In November, 1921, these two notes were paid by respondent giving another note for $3,000, and by a $7,000 credit raised by the security company upon a mortgage on other of respondent's lands. Warford testifies that, at the time of this payment, if it be a payment, he demanded back the Sauer mortgage, and contends that both E. S. Gold and L. A. Gold promised to return the same to him on several occasions; but L. A. Gold, his witness, testifies that no demand was made upon him, and no assurance of effort to get back the Sauer mortgage made until after he had left the bank and took over the management of the security company. It is undisputed that the security company never paid its $9,000 demand note to which the Sauer note and mortgage was attached as collateral and that it is still held by the successors of the Central Bank, and that the original is filed with the receiver of the security company as a claim. This suit is brought by the respondent for the conversion of the Sauer mortgage alleged to have been converted, not by the security company, but by the defendant bank on March 15, 1920.

[1, 2] Assuming that the dealings of the bank and the security company were so involved that one of their clients might have been misled into supposing that he was dealing with the security company, as respondent contends he was misled, we have,

nevertheless, no evidence that the mortgage for the conversion of which this action is brought was ever in the physical possession of the appellant bank, unless it be by virtue of the acts of E. S. Gold who, while, by his own testimony, he was acting for the security company, was at the same time a vice president of the defendant bank. The mortgage was made to the security company as mortgagee. It was assigned by the security company as mortgagee. It was sent by the manager of the security company to the Central Bank of Minneapolis as collateral to the security company's note. That note is held by the successor to the Central Bank, and the mortgage in suit is held as collateral thereto. It is true that, six months after this mortgage was assigned by the security company to the Central Bank, respondent was able to secure from the defendant bank $4,000 more on the strength of the fact that the security company had obtained $4,000 more from the Central Bank than he had been able to obtain from the security company; but this is greater evidence of ratification of the conversion alleged than evidence that the bank converted the same. However, as to whether the acts of E. S. Gold were the acts of appellant bank, he being its vice president, or whether the conversion, if such there has been, was the conversion of the security company through E. S. Gold, its managing officer, is not the function of this court to determine, but rather the function of the trial court to weigh the evidence and find the facts; and this rule is all the more applicable to this case, for the reason that it must be remanded for a new trial; whereupon such findings may be made as then appear proper on the evidence. This reason appears in that assignment of error based upon the denial to appellant of the right to show the actual value of this $9,000 second mortgage at the time of the alleged conversion; the trial court proceeding upon the theory that the bank obtained $9,000, and therefore that sum should be the measure of damages. Central Trust Co. v. West India Imp. Co., 144 App. Div. 560, 129 N. Y. S. 730; First National Bank v. Dickson, 5 Dak. 286, 40 N. W. 351, are cited by respondent in support of this position.

[3]    However, the undisputed evidence is that $9,000 was not secured by a sale of the Sauer note and mortgage, but by the execution and delivery to the Central Bank of the security company's note for $9,000. Furthermore, the undisputed evidence in

the case is that the mortgagor who executed the mortgage and the note secured thereby had no other property; that, long prior to the suit, he had executed and sent to the respondent a quitclaim deed to the land covered by the mortgage; and, while the record is silent as to whether the respondent is now the owner of the land covered by the mortgage, his own testimony is to the effect that he is in possession of the same, and has leased it, and is collecting the rents and profits therefrom, and that he has not paid this mortgage or any part of it. Assuming that respondent had made out a prima facie case of the value of said mortgage by showing the amount secured thereby, under First National Bank v. Dickson, supra, and section 1987, Rev. Code 1919, and Grigsby v. Day, 9 S. D. 585, 596, 70 N. W. 881, and cases cited therein, yet, under the rule in those cases, appellant should not have been deprived of the right to show the actual value of said mortgage at the time of the alleged conversion. For this reason, the judgment and order appealed from are reversed, and the case remanded for a new trial.

CAMPBELL, P. J., and SHERWOOD and GATES, JJ., concur.

POLLEY and BURCH, JJ., not sitting.